IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 8, 2016 Session

**STATE OF TENNESSEE v. QUINCY TERRELL BRANDO SHARPE**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-A-471      Mark J. Fishburn, Judge**
_____

**No. M2015-00927-CCA-R3-CD – Filed November 2, 2016**
_____

Defendant, Quincy Terrell Sharpe, was indicted by the Davidson County Grand Jury, along with his co-defendant DeAndre D. Rucker, for premeditated first degree murder. Defendant and Rucker were tried jointly, and both were convicted as charged. The trial court sentenced Defendant to a term of life imprisonment. In this appeal as of right, Defendant contends that the prosecutor committed prosecutorial misconduct during closing argument and that the evidence was insufficient to support his conviction. Following our review, we conclude that the Defendant is entitled to a reversal of his conviction based on prosecutorial misconduct by the State during closing argument. Accordingly, we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3, Appeal as of Right;**
**Judgment of the Trial Court Reversed and Remanded**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Joshua L. Brand, Nashville, Tennessee, for the appellant, Quincy Terrell Brando Sharpe.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Rob McGuire and Janice Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts*

Defendant and his co-defendant, Deandre Rucker, were convicted for the first degree premeditated murder in the shooting death of Demetrius O. Riley.

Evelyn Carter testified that her seventeen-year-old grandson Darius Rucker (who is not related to co-defendant Deandre Rucker) lived with her in October, 2009. At approximately 1:30 p.m. on October 8, 2009, Ms. Carter was sitting outside of her home. She testified that Defendant came to her house looking for her grandson. She told Defendant that he had not yet arrived home from school. At approximately 2:30 or 2:45 p.m., an orange Pontiac driven by Deandre Rucker pulled up in front of her house. Defendant got into the vehicle, and the car was driven away. Ms. Carter knew Defendant by the nickname of "Bran-Bran." Ms. Carter's grandson arrived home from school shortly after they left. Deandre Rucker dropped off Defendant at Ms. Carter's home 30 to 45 minutes after they left. She recalled that Jerry Springer was on television, and that show came on at 3:00 p.m.

Ms. Carter testified that Defendant was "[s]cary looking" when he returned. She testified that "his eyes were big," and she asked him what he had done. Ms. Carter followed Defendant inside, and Defendant asked to wash his hands. He asked Ms. Carter if she had any bleach. Defendant asked Ms. Carter's grandson to borrow a pair of shoes. Defendant changed shoes and put the shoes he had been wearing inside the neighbor's Jeep. Ms. Carter heard Defendant tell her grandson that he (Defendant) had shot "Deboskey." Ms. Carter testified that she heard Defendant tell her grandson that he shot the victim, the victim fell, and Defendant "went over and shot him again and stood there and looked at the blood run out of his mouth." Ms. Carter heard helicopters flying around outside her home. She testified that Defendant called Deandre Rucker and told him that he "needed to get rid of that orange car." Defendant left Ms. Carter's house approximately 20 minutes after he arrived. Ms. Carter testified that she did not contact the police because she "was afraid for [her]self and [her] grandson." Ms. Carter eventually contacted Sergeant Pat Postiglione after she had moved out of state.

On cross-examination, Ms. Carter testified that she did not see Defendant with a gun on the day of the shooting, and she did not see any blood on Defendant. She recalled that she also heard Defendant tell Deandre Rucker "to get rid of the gun as well [as] the orange Pontiac." Ms. Carter testified about an incident in September, 2010, where Deandre Rucker came to her house with a gun. She contacted police in October, 2010, about the incident that occurred one year prior. Ms. Carter acknowledged that some of her statements to detectives were inconsistent. She agreed that she told Detective Tarkington that there was a third man in the car, but she had previously told Detective Fuqua that she did not see anyone else in the car. She also acknowledged that she did not testify in a prior court proceeding in January, 2011, that Deandre Rucker had threatened her grandson in 2009. Ms. Carter testified that she had been reluctant to come forward because of violence in the neighborhood.

Sammeca Hall testified that she was sitting on her front porch in October, 2009, when the victim, who was known as "Deboskey," was shot. She saw Deandre Rucker driving an orange car. She testified that her boyfriend, William Stokes, who was known as "Chill Will," was in the front passenger seat with the window down. She heard Mr. Stokes say that they were "gonna handle some whacks." About 30 or 40 minutes after the car left, Ms. Hall learned that someone had been shot nearby. Ms. Hall testified on cross-examination that she knew Defendant, and she did not see him inside the orange car. She agreed that she told Detective Fuqua that she could not see who was inside the car because the windows were tinted. Ms. Hall testified that Mr. Stokes died prior to trial.

Charles Mount, Jr., testified that he was currently incarcerated on federal drug trafficking charges. Mr. Mount had previously been incarcerated with Defendant. He testified that while they were cellmates, Defendant told him that he shot the victim "three times, then ran up on him and shot him some more." He testified that he and Defendant had "numerous conversations" about the shooting and that Defendant had initially asserted his innocence, but he admitted the shooting after he became more comfortable around Mr. Mount.

Antonio Flenoy was serving a sentence for aggravated assault. He testified that the victim was his "homeboy." He testified that he did not know Defendant before the shooting. On October 8, 2009, Mr. Flenoy was walking down the street with the victim when an orange car drove past them. He testified, "we didn't think that car was fixin' to shoot or whatever, you feel me, so we kept on walking." About five or ten minutes later, "a little dude come down the hill . . . and started shooting." As Mr. Flenoy ran, he looked back and saw the victim fall to the ground. Mr. Flenoy testified that he "didn't get a good look at [the shooter's] face," but he looked young, "like he was just . . . out of school[.]"

Dr. Thomas Deering testified that the victim died as a result of multiple gunshot wounds of the torso.

Sergeant Pat Postiglione testified that in October, 2010, he was contacted by Evelyn Carter, who stated that she had information about the shooting but was afraid to come forward. Sergeant Postiglione met with Ms. Carter, and she provided the names of three suspects: Defendant, Deandre Rucker, and William Stokes. Sergeant Postiglione testified that he instructed Ms. Carter not to say anything about her cooperation with police when she went to court on an unrelated matter involving Deandre Rucker. Sergeant Postiglione testified that Ms. Carter told him that it was a few hours between the time that the orange car left her house and when it returned.

3

Marquita Winters testified that the victim, whose nickname was Deboskey, was the father of one of her children. She knew Defendant and Deandre Rucker. In August, 2011, Defendant called Ms. Winters and told her that he needed to talk to her. Defendant told Ms. Winters that he had killed the victim and promised that he would care for her son as if he was the child's father. Ms. Winters waited a few days before she contacted the police because she was hoping to get more information from Defendant.

Detective Norris Tarkington, an investigator with the Metro Police Department's Cold Case Unit, testified that he was assigned to investigate the case in January, 2011. He had also been to the crime scene on the day of the shooting. He testified that six shell casings that came from the same weapon were recovered from the crime scene, but the weapon was never recovered. Detective Tarkington interviewed Ms. Carter. He testified that her prior statements to other investigators were "just pretty much down the line just like she told me." Ms. Carter told Detective Tarkington that Defendant left in the orange car with Deandre Rucker and they returned approximately 30 minutes later. Ms. Carter was afraid, and Detective Tarkington escorted her to court on another case involving Rucker.

Detective Tarkington also interviewed Semeca Hall after he reviewed notes from Detective Fuqua's interview of Ms. Hall in October, 2009. Ms. Hall identified Deandre Rucker as the driver of the orange car. She knew Rucker by his nickname "Dreezy." Ms. Hall told Detective Tarkington that William Stokes was also in the car and that she heard someone say they were going "to go handle some whacks." Ms. Hall expressed reluctance to testify.

Detective Tarkington also interviewed William Mount, who told him that Defendant had initially stated he did not shoot the victim, but later admitted to Mr. Mount that he killed the victim. Mr. Mount told Detective Tarkington that Defendant stood over the victim after he fell to the ground and shot him again and watched as blood came out of the victim's mouth. Mr. Mount told Detective Tarkington that Defendant had used a 9 millimeter gun to shoot the victim. Detective Tarkington testified that the shell casings found at the crime scene were 9 millimeter, and that information had not been made public.

On cross-examination, Detective Tarkington testified that he interviewed Antonio Flenoy on the day of the shooting, and Detective Tarkington's notes did not indicate that Mr. Flenoy said anything about seeing an orange car. Detective Tarkington did not remember Ms. Carter telling him about overhearing Defendant tell Rucker on the phone to get rid of the orange car. Ms. Carter told Detective Tarkington that she saw Defendant get into an orange car, but she did not know who the driver was at that time. She also saw a third person in the vehicle, but she could not identify that person. Ms. Carter did

not tell Detective Tarkington that Defendant put his shoes inside a neighbor's Jeep. Detective Tarkington agreed that he did not discover any physical evidence connecting either Defendant or Rucker to the homicide.

Defendant testified that he was 17 years old at the time of the shooting. He testified that he was at Ms. Carter's house waiting for Darius Rucker to get off of the school bus when an orange car being driven by William Stokes, or "Chill Will," pulled up. He testified that Steven Kimbrough, who was known as "Keezy," was a passenger in the car. William Stokes told Defendant to get in the car, and they left. Stokes told Defendant that "he need[ed] his strap," which Defendant testified was Stokes' gun, and Defendant retrieved the gun for Stokes from Defendant's house. Defendant stayed at his house, and Stokes later returned to drop off his gun. Defendant asked Stokes to drive him back to Ms. Carter's house. Defendant testified, "yes, I was spooked because I don't know what they had just did with this gun or whatever[.]" Defendant testified that he did not go inside Ms. Carter's house. He denied that he washed his hands, asked Ms. Carter for bleach, or changed his shoes.

Defendant denied that he told Ms. Winters that he shot the victim. He testified that Ms. Winters' cousin told her that he had shot the victim because she was angry that he had ended his relationship with her. Defendant testified that he was at Ms. Carter's house when the shooting occurred. He testified that Stokes and Kimbrough, the two individuals he testified were inside the orange car, had since died. On cross-examination, Defendant acknowledged that he was untruthful when he told Detective Fuqua that he had never been in the orange car.

Rico Boyce testified on behalf of Defendant. Mr. Boyce testified that he grew up with Defendant. He testified that he saw Defendant get into an orange car at Ms. Carter's house. "Chill Will" and "Keezy" were in the vehicle. Mr. Boyce could not recall whether it was on the day of the shooting because he did not know what day the shooting occurred.

*Analysis*

Defendant contends that the prosecutor committed prosecutorial misconduct during closing arguments. Defendant concedes that he failed to raise the issue in his motion for new trial.

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . misconduct of . . . counsel, or other action committed or occurring during the trial of the case, or other ground upon

5

which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e).

This court may nonetheless consider a waived issue if the defendant can establish that it constituted plain error. *See* Tenn. R.App. P. 36(b). There are five factors that must be established before an error may be recognized as plain:

(a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the accused did not waive the right for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The burden is on the defendant to establish all five factors, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* Furthermore, the error must be "clear" or "obvious," *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and must be of "such a great magnitude that it probably changed the outcome of the trial." *Smith*, 24 S.W.3d at 283.

Defendant complains that the prosecutor committed prosecutorial misconduct by quoting inflammatory rap lyrics that had been specifically excluded during pretrial motions. While Defendant's appeal was pending, his co-defendant Rucker also had a separate appeal pending, and a panel of this court reversed his conviction, concluding that the prosecutor's comments were improper and inflammatory. *State v. Deandre D. Rucker*, No. M2014-00742-CCA-R3-CD, 2015 WL 4126756, *3-6 (Tenn. Crim. App., at Nashville, July 9, 2015), *no perm. app. filed*. Defendant requests that this court grant the same relief to him.

Defendant and Mr. Rucker were tried together for first degree murder. Prior to trial, co-defendant Rucker filed a motion for severance, which the State opposed. The trial court denied the motion, and co-defendant Rucker filed a motion to reconsider. The trial court entered an amended memorandum opinion, in which it described information provided by the State in its supplemental discovery response pertaining to material found on co-defendant Rucker's social media accounts. The material consisted of violent rap lyrics and material suggesting co-defendant Rucker's gang affiliation. The State's theory at trial was that Defendant and Rucker were gang members and that Defendant shot the victim at the direction of Rucker. The trial court again denied the motion to sever, but

6

the trial court specifically precluded the State from making reference to gang affiliation, stating, "Accordingly, the court respectfully denies the motion to sever with the clear directive that the State is prohibited in any manner [from] arguing or suggesting that [Defendant] Sharpe's admitted gang affiliation has any relevance to [co-defendant] Rucker."

In another pretrial motion, co-defendant Rucker sought to exclude any evidence of material from Mr. Rucker's social media accounts, specifically "any music purported to be written and/or produced by him." *Rucker*, 2015 WL 4126756, at *4. At a hearing on co-defendant Rucker's various pretrial motions, the prosecutor orally responded to the motion that "[a]s much as I would appreciate being able to use [a reference to the music], I think the Court has really already ruled on those kinds of things."

In the State's rebuttal argument, the prosecutor recited the lyrics from a rap song from Mr. Rucker's social media page, which used a slang word for a racial epithet, and asserted that the song explained why Defendant killed the victim:

> I don't know if this is going to come as a surprise, but I really like rap music, I always have, Snoop Dogg, Jay-Z, now Drake and some others, and I have them because of the artistry of that music form can transport me to places that I don't know about. They can describe with vivid, even brutality, things that are foreign to my experience, things that I don't know about. There are obviously like any song anywhere in the world, there are good things, songs about good things and songs about bad things, there are songs that don't have anything to do with rap about good things and bad things, it's the difference between Good Vibrations and Folsom Prison Blues. It's the difference between Nothing but a G thing and a song about somebody getting killed. But music can take us to a different place and it can explain things that we have a hard time explaining ourselves. There's a local rapper who doesn't . . . have anything to do with this case, it's just I heard it, he's local, and describe this lyric. And it's got some rough language and I apologize it says, *"N----s wanna play, so they going down. N----s wanna beef, so I cut 'em down. When you see me, you better move around unless you want to duk down."* That's why you drive an orange car. That's why you get your little man to do it for you. *"If you see me, you better move around."* Three o'clock in the afternoon on a Thursday, don't matter, bunch of people, I'll get ya, I'm gonna be feared, I'm to be respected, and so when you get caught up, you won't put my name in it, you'll put the name in it of the two dead guys. It is something incomprehensible, but we know that there are rough men out there ready to do violence, and they do

7

> violence when people fear them. It still doesn't give us a good reason
> why. It is cold comfort to [the victim's family].

*Id.* at *4-5.

Counsel for co-defendant Rucker immediately requested a bench conference, "at which defense counsel sought a mistrial, one of the bases for which was the State's recitation of and arguments regarding the rap lyrics. After arguments of counsel as to this oral motion, the trial court ruled that 'none of those things are grounds for a mistrial or even to give a curative instruction to the jury.'" *Id.* at *5. On appeal, a panel of this court concluded that the prosecutor's comments were improper:

> We conclude that the State committed prosecutorial misconduct by this portion of the rebuttal argument. Racial insults are not permissible simply because they were in material quoted by the speaker and the words of a "local rapper who doesn't . . . have anything to do with this case." The racial epithets appear to have had no purpose other than to place the defendant in a bad light, appeal to racial prejudice, and, apparently, suggest [Rucker] occupied a position superior to that of [Defendant], [Rucker] getting his "little man" to commit the killing. No attempt was made by the State to tie the violent and belligerent attitude of the rap lyricist to specific actions of [Rucker]. *It is particularly puzzling why, after [Rucker] had asked at the hearing on his motion in limine that the State would not utilize the rap lyrics in any fashion, to which the State appeared to agree, the State would later quote those very lyrics in the rebuttal argument.*

*Id.* at *6 (emphasis added).

Addressing the *Adkisson* factors, the record clearly establishes what occurred in the trial court, and the error breached a clear and unequivocal rule of law, as is made plain in the opinion in *Rucker*. It is misconduct for a prosecutor to "use arguments calculated to inflame the passions or prejudices of the jury." *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). Nothing in the record suggests that the error was waived for tactical reasons. The State argues, however that the error was not so inflammatory that it affected the verdict to Defendant's detriment and that the error was not so significant that it probably changed the outcome of the trial. The State relies upon the strength of its case against Defendant, whereas a panel of this court concluded that the evidence against Rucker was "circumstantial, not overwhelming."

8

Once a court determines that a prosecutor has committed misconduct in closing argument, the test for reversible error is whether the argument was so inflammatory that it affected the verdict to the defendant's detriment. *Goltz*, 111 S.W.3d at 5. In measuring the prejudicial impact of any misconduct, the appellate court will consider:

(1) the facts and circumstances of the case;
(2) any curative measures undertaken by the court and the prosecutor;
(3) the intent of the prosecution;
(4) the cumulative effect of the improper conduct and any other errors in the record; and
(5) the relative strength or weakness of the case.

*Id*. (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In this case, the State resisted severance and argued very insistently in favor of trying the defendants jointly. The issue of admissibility of gang references was litigated extensively prior to trial. The trial court specifically directed the State not to make any reference to the rap lyrics at trial, and the State blatantly disregarded the trial court's order. Also, we note that the State did not seek permission to appeal from the reversal of Rucker's conviction by filing an application under Rule 11 of the Tennessee Rules of Appellate Procedure.

The inflammatory comments made by the prosecutor during rebuttal argument were not specifically directed at either of the co-defendants. The comments were just as egregious to Defendant as to co-defendant Rucker. The State's blatant disregard of the trial court's order weighs against the State with regard to the intent of the prosecution. The trial court declined to give a curative instruction to the jury. We recognize that the relative strength of the State's case against Defendant is greater because of evidence of Defendant's admissions of guilt to various witnesses. However, we conclude that in order to do substantial justice, both defendants must receive a new trial. We cannot deny Defendant a new trial for the same misconduct that resulted in a new trial for his co-defendant. Accordingly, we conclude that Defendant's conviction should be reversed and this case remanded for a new trial.

### Sufficiency of the evidence

Although we have concluded that the conviction should be reversed, we will address Defendant's contention that the evidence was insufficient to sustain his conviction in the event of further appellate review in this matter. We note that even when the evidence is legally sufficient to support a conviction, in some cases trial court or prosecutorial error requires the grant of a new trial.

9

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007) (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978)). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. *Id.* Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of first degree murder, which is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Premeditation is defined as:

> An act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Whether premeditation exists is a question for the jury as the trier of fact and may be established by any evidence from which it may infer that the killing was committed "after the exercise of reflection and judgment." *State v. Adams*, 405 S.W.3d 641, 662 (Tenn. 2013). Non-exhaustive factors relevant to premeditation include the procurement of a deadly weapon and the use of it upon an unarmed victim; destruction or secretion of evidence of the crime; and the defendant's calmness after the killing. *Id.* at 662-63

(citing *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003)). Also relevant is evidence of the defendant's motive and the nature of the killing. *Id*. at 663 (citing *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998)). Regarding the nature of the killing, the infliction of multiple wounds is a relevant consideration, although not sufficient standing alone to show premeditation. *Id*. (citing *State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001)). A lack of provocation on the part of the victim and the defendant's failure to render aid are also factors giving rise to an inference of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

In finding the evidence sufficient to support Deandre Rucker's conviction for criminal responsibility for the actions of Defendant, a panel of this court stated:

> Taken in the light most favorable to the State, Evelyn Carter testified that, between 2:30 and 2:45 p.m. the day of the homicide, the [co-defendant], driving an orange Pontiac, stopped by her house and motioned to the [defendant], who got into the car. Antonio Flenoy testified that he was walking with the victim at approximately 3:00 p.m. when they were approached from behind by a man he did not know, who shot the victim as Flenoy ran away. He said that five to ten minutes before the shooting, an orange Pontiac had passed by them. When [Defendant] returned to Ms. Carter's house thirty to forty-five minutes later, he was "[s]cary looking" and told Ms. Carter's grandson that he had shot "Deboskey." Marquita Winters later testified that "Deboskey" was the victim's nickname. Ms. Carter also said that she heard [Defendant] make a telephone call, saying to get rid of the orange car and the gun. She assumed he was talking to the [co-defendant] because he had been driving an orange car. Sammeca Hall testified she saw Williams Stokes, her boyfriend, as a passenger in the orange vehicle before the shooting and heard him say they were going to "handle some whacks." She assumed the driver was the [co-defendant] because he had such a car.

*Rucker*, 2015 WL 4126756, at *7.

Ms. Carter testified that she overheard Defendant confess to the killing, talk to the co-defendant about disposing of evidence, and Defendant asked her for bleach and borrowed shoes from her grandson. Defendant told her grandson that he shot the victim again after he fell and watched blood coming from his mouth. Defendant confessed to Marquita Winters, the mother of the victim's son, that he committed the murder. Defendant also admitted the shooting to Charles Mount, a cellmate. Defendant told Mr. Mount that after he shot the victim, he "ran up on him" and shot him multiple times.

11

Based upon the liberal inferences afforded the State on appeal from a conviction, we conclude that a reasonable jury could rationally conclude from the evidence that Defendant committed the killing intentionally and with premeditation. The evidence was legally sufficient to support Defendant's conviction. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, we reverse the judgment of the trial court and remand this matter for a new trial.

_____
THOMAS T. WOODALL, PRESIDING JUDGE